# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| TERESA HEAVIN, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No. 4:10CV00573 AGF |

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Teresa Heavin was not disabled and, thus, not entitled to Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on April 26, 1964, filed an application for SSI on March 27, 2003, prior to the application involved in the present case, alleging a disability onset date of February 11, 2003, at age 38, due to degenerative arthritis of the lumbar spine. By decision dated June 7, 2005, an administrative law judge ("ALJ") found that Plaintiff had depressive disorder, post-traumatic stress disorder, and mild degenerative changes of the lumber spine, but that she had the residual functional capacity ("RFC") to perform "the full range of unskilled light work," and based on her age, education, and work experience, was not disabled under the Act. (Tr. 58-68.)

Plaintiff filed the current application for benefits on March 20, 2006, at the age of 42, alleging a disability onset date of February 11, 2003, which was later amended to June 8, 2005, due to degenerative arthritis of the lumbar spine, bipolar disorder, shortness of breath, and problems with her feet (having had multiple surgeries for planters warts on each foot).  After Plaintiff's application was denied at the initial administrative level, a hearing was held on August 15, 2007, before a different ALJ.  By decision dated March 27, 2008, the ALJ found that Plaintiff had the RFC for a limited range of light work, and based on the testimony of a vocational expert, could perform certain jobs that were available in the national economy, rendering her not disabled.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on February 2, 2010.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff argues that the ALJ did not properly weigh and consider the opinions of various medical sources.  In addition, Plaintiff asserts that the ALJ improperly evaluated Plaintiff's credibility.  Plaintiff asks that the ALJ's decision be reversed and remanded for an award of benefits or for reconsideration.

## BACKGROUND

### Work History

The record indicates that Plaintiff worked as a certified nurse's assistant in a nursing home at various times from 1984 to 2005. (Tr. 166.)  During this time, Plaintiff

had annual earnings of over $5,000 in only three years and had five years with no reported earnings. (Tr. 128.)

**Medical Record**

Many of the medical records submitted to the Court predate June 7, 2005, the date Plaintiff's first application for SSI benefits was denied. These records generally document a history of degenerative spine disease and depression, and include a September 2004 Medical Source Statement by John Pearson, M.D., stating that Plaintiff would be limited in her ability to stand or walk, and a February 2005 report by examining psychologist Paul Rexroat, Ph.D., diagnosing a Global Assessment of Functioning ("GAF") score of 45-50,[1] major depression recurrent, and borderline intellectual functioning.

On July 28, 2005, Plaintiff was discharged by her previous physician after failing to show up for three consecutive appointments for an MRI of her lumbar spine. (Tr. 305-08.) In August 2005, Plaintiff's psychiatrist, Ahmed Zubairi, M.D., reported significant improvement. He continued her on Cymbalta and Xanax, reduced her dosage of Paxil, and increased her dosage of Seroquel for insomnia. (Tr. 317.) On September 21, 2005,

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

Dr. Zubairi questioned Plaintiff about a report he had received from Medicaid indicating that Plaintiff had requested prescriptions for Percocet and Vicodin from different doctors and filled them within a short period of time. Plaintiff denied ever abusing these medications. Dr. Zubairi assessed that Plaintiff was doing well and tolerating her medications very well. He continued her on Cymbalta, Paxil, Xanax, and Seroquel. (Tr. 316-17.)

On March 23, 2006, Plaintiff began treatment with Jawed Bharwani, M.D., reporting low back pain. Examination revealed a loss of lumbar spine curvature and "some difficulty" with toe walking because of plantar warts on the balls of her foot. She was diagnosed with chronic low back pain. (Tr. 563-64.) On April 24, 2006, Plaintiff told Dr. Bharwani that her pain medications did not help her back pain. He noted that there was no evidence of bulging discs and prescribed different pain medications. Dr. Bharwani continued to provide treatment through December 20, 2006. On March 2, May 24, July 26, and December 20, 2006, Plaintiff was a "no show" for scheduled appointments. (Tr. 552-64.)

On May 9, 2006, state consulting psychologist Thomas Spencer, Psy.D., examined Plaintiff in connection with her application for disability benefits. He found mild psychomotor retardation and diagnosed Plaintiff with recurrent, moderate to severe major depressive disorder, with the possibility of ("rule out") bipolar disorder and borderline personality disorder. Dr. Spencer assessed a GAF of 45-50, and opined that Plaintiff would be able to follow simple to moderately complex instructions. He noted that

4

Plaintiff appeared to be of average intelligence. Dr. Spencer stated that Plaintiff's capacity to interact in social situations appeared moderately impaired based upon her self-report; however, she was able to interact in an appropriate manner during the examination. Dr. Spencer also noted that Plaintiff has a history of alcohol and methamphetamine abuse, and that despite Plaintiff's complaint of chronic back pain, she presented in no acute physical distress. (Tr. 512-15.)

The record includes a Physical RFC Assessment, completed by a non-examining, non-medical state disability consultant, who wrote that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and stand, walk, and sit for six hours in an eight-hour workday. (Tr. 521-27.)

On May 22, 2006, state non-examining psychological consultant, P. Stuve, Ph.D., completed a Psychiatric Review Technique Form and Mental RFC Assessment. The Psychiatric Review stated that Plaintiff had major depression, which resulted in a mild restriction on activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. The Mental RFC Assessment stated that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to respond appropriately to changes in the work setting. (Tr. 528-43.)

On June 21, 2006, Plaintiff was seen by orthopedic surgeon Michael Clarke, M.D., for a determination of her eligibility for Medicaid. After examination, Dr. Clarke determined that Plaintiff had "some mild-to-moderate degenerative changes in the facet joints of her back, but no other significant abnormality." Dr. Clarke then stated that he "did not think [Plaintiff] has enough objective pathology to prevent her from working under the definition for Medicaid." (Tr. 549-51.)

On November 21, 2006, Plaintiff established care at a family health clinic, complaining of degenerative joint disease in the back. It was noted that Plaintiff had been smoking a pack of cigarettes per day for 20 years. Plaintiff continued treatment with the clinic through September 25, 2007, during which time she was prescribed Xanax, Cymbalta, and Lunesta. She was also prescribed Chantix to help her quit smoking, but she never filled the prescription. (Tr. 620-27.)

On November 30, 2006, Plaintiff reported to Glenn Kunkel, M.D., for pain management, upon referral by the clinic. Examination of Plaintiff's lumbar spine revealed a full range of motion, with normal sensation, motor, reflex testing and hip rotation, and negative straight leg raise testing. Dr. Kunkel diagnosed lumbar radiculopathy, lumbar degenerative disc disease, lumbar spinal stenosis, lumbar facet syndrome, and chronic obstructive pulmonary disease. He noted that Plaintiff's current medications included Prozac, Abilify, Cymbalta, Xanax, and Trazadone. From December 7, 2006 through February 28, 2007, Dr. Kunkel administered nerve root blocks, facet injections, sacroilitis injections, and radiofrequency thermocoagulation in an

6

attempt to treat Plaintiff's pain.  (Tr. 576-89.)

An MRI of the cervical spine on January 19, 2007, revealed a minimal disc bulge at C5-6.  (Tr. 582.)  An MRI of the lumbar spine referred to in Dr. Kunkel's treatment notes dated April 17, 2007, showed narrowing at L3-4 and L5-S1, with degenerative disc and facet changes at multiple sites.  (Tr. 572.)

**Evidentiary Hearing of August 15, 2007 (Tr. 27-54)**

Plaintiff, who was represented by counsel, testified that she was 43 years old and living with her husband, daughter, daughter's boyfriend, and two grandchildren, ages eight and six, in a mobile home.  Plaintiff had an eighth grade education.  She testified that she worked for one day as a cook in December 2006, but left because her feet were "burning" and her back could not handle the stress.  Plaintiff stated that she only drove about once every two weeks and smoked a pack of cigarettes a day.  She testified that her depression was also keeping her from working.  She was not under the care of a psychiatrist at the time of the hearing.

Plaintiff testified that she had had eight or nine surgeries on each foot, the last being in 2003, and that she had a burning sensation in her left foot, which was brought on by standing on it or wearing tennis shoes.  She was not seeing any doctors at the time for these problems because she could not afford to.

Plaintiff testified that she had daily chronic pain in her lower back, and was currently having injections into her feet every week to treat this back pain.  She testified that she put ice on her back three to four times a day, and slept in a recliner to relieve the

7

pain, which radiated into her sides. Before she received the shots each week, the pain would also radiate down her legs.

Plaintiff testified that she started having neck pain three to four months prior to the hearing, and was scheduled to have her first round of medication injected into her neck the following day. She testified that it was difficult to turn her head to check her rear view mirror while driving. Plaintiff also testified that two fingers on her right hand would go numb almost every morning and every evening.

In response to questions about her depression, Plaintiff stated that she had reoccurring thoughts of being molested as a child. She testified that her depression kept her from work because her mind did not focus. Plaintiff testified that she "occasionally" would sleep for only three to four hours a night, and on those occasions would take a nap during the day. She also testified that her medications, which she took at night, made her tired and groggy for half an hour. Plaintiff testified that she could only sit for five to ten minutes before having to stand up or shift positions. If able to shift, she could sit for a "couple" of hours. Plaintiff could stand for 15 minutes at a time.

The ALJ asked the vocational expert to consider an individual of Plaintiff's age, education, and work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for six out of eight hours; sit for six out of eight; occasionally stoop and crouch; and only perform simple work activity, with no more than occasional interaction with supervisors, co-workers, and the public. The individual also had to avoid concentrated exposure to dust, smoke, gas, and fumes, and could not rotate

her head to look behind herself.  The vocational expert testified that such an individual could perform unskilled jobs such as an electrical assembler, electrical accessory assembler, or a hand packager, and that these jobs existed in significant numbers in the state economy.

**Post-Hearing Evidence**

Progress notes dated August 16, 2007, stated that Plaintiff requested a refill of her Xanax, which was not due to be refilled until the next week.  (Tr. 622.)

On October 8, 2007, Dr. Kunkel performed a lumbar discography at three levels which did not "recreate the concordant pain response."  It was noted that Plaintiff had a slightly degenerated disk at L5-S1, which might be the cause of some of her pain.  (Tr. 637-39.)  On December 19, 2007, Plaintiff had trial spinal cord stimulator electrode leads placed in her back.  The leads were removed three days later, due to an allergic reaction. (Tr. 630-36.)  On February 13, 2008, Plaintiff underwent implantation of a trial epidural pump.  (Tr. 647.)  It was noted that Plaintiff showed increased scores for depression and somatization on a P3 profile assessment.[2]  (Tr. 635.)  After placement of the epidural pump, Plaintiff developed significant desaturations on room air as well as with oxygen, and the pump was removed.  Dr. Kunkel then "discharged [Plaintiff] without restriction," and scheduled a return visit in two weeks for re-evaluation.  (Tr. 647-48.)

---

[2] The Pain Patient Profile (P3) assessment focuses on the factors most frequently associated with chronic pain. The test can help provide an objective link between the physician's observations and the possible need for further psychological assessment.

9

**ALJ's Decision of March 27, 2008 (Tr. 9-26)**

The ALJ first held that the prior decision of June 7, 2005, was *res judicata* as to Plaintiff's non-disability as of that date. The ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of March 20, 2006, and had the severe impairments of degenerative joint disease, chronic obstructive pulmonary disease, depression, and residuals from past left-foot surgery. The ALJ summarized the medical record including the post-hearing evidence, and determined that additional development of the record was not required. The ALJ found that none of Plaintiff's impairments, individually or in combination, met the requirements for any deemed-disabling impairment listed in the Commissioner's regulations.

The ALJ then found that Plaintiff had the RFC to perform light work[3] with limitations to only occasionally stooping or crouching, and to simple work activity, with no more than occasional interaction with supervisors, co-workers, or members of the public. Plaintiff also had to avoid concentrated exposure to dust, smoke, gasses, and fumes, and was not to rotate her head to look behind her.

---

[3] Light work is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls. Social Security Ruling 83-10, 1983 WL 31251, at *6, elaborates that light work requires standing or walking, off and on, for a total of approximately six hours of an eight hour work day, while sitting may occur intermittently during the remaining time; that the lifting requirement generally required occasional, rather than frequent, stooping; and that for many unskilled light jobs, the ability to stand was more critical than the ability to walk.

In support of this RFC assessment, the ALJ stated that Plaintiff's medically determinable impairments could reasonably be expected to produce some symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not "entirely reliable." The ALJ stated that Plaintiff had a propensity for non-compliance, and that there were "numerous instances through the record of not keeping appointments and failing to show for diagnostic procedures." Additionally, the ALJ stated that Plaintiff had engaged in suspicious drug-seeking behavior, had a history of drug and alcohol abuse, and had tried as recently as August 2007 to get more Xanax before it was time for a refill. The ALJ noted that while there was no objective diagnosis of drug abuse, Plaintiff's overall pattern "was questioned."

The ALJ also stated that Dr. Kunkel's treatment regimen was "difficult to understand." The ALJ noted that without first obtaining any objective diagnostic findings, Dr. Kunkel immediately started Plaintiff on a series of injections and procedures. Additionally, the ALJ noted that Dr. Kunkel never stated that Plaintiff was disabled, nor did his records show significant abnormalities.

Plaintiff's poor earnings and work history were noted by the ALJ, who found that such a poor work/earnings history suggested that Plaintiff had no motive to engage in substantial gainful activity. The ALJ referenced the state non-medical consultant's Physical RFC assessment, giving it "some weight."

The ALJ found that Plaintiff was unable to perform any past relevant work, and relying on the VE's testimony, concluded that Plaintiff was capable of making a

11

successful adjustment to other work that existed in significant numbers in the national economy, and was thus, not disabled.

**New Evidence Presented to Appeals Council, and Appeals Council's Decision**

Medical records submitted to the Appeals Council after the ALJ decision show that Plaintiff continued to receive injections for treatment of her pain. (Tr. 761.) She underwent another MRI in May 2008 which showed a slight increase in the central disc protrusion at C4-5. (Tr. 758.) An MRI of the thoracic spine on the same date revealed a right central disc protrusion at T12-L1. (Tr. 757.) An MRI of the lumbar spine in April 2009 revealed degenerative disc disease with central disc bulging and protrusion at L4-5. (Tr. 708.) Plaintiff continued to undergo pain management procedures on both the cervical spine and the lumbar spine. (Tr. 743, 731.) The Appeals Council summarily stated that it found no reason to review the ALJ's decision, and therefore denied Plaintiff's request for review.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'" *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). The court "'may not reverse . . . merely because substantial evidence would support a contrary outcome.' Substantial evidence is that which a

reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a severe impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. § 404.1520a(c)(3).

If the impairment or combination of impairments is severe and meets the duration

requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

This burden can be met by the testimony of a vocational expert in response to a hypothetical question that takes into account all of the claimant's impairments that the ALJ properly finds are supported by the record. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).

When, as here, the Appeals Council has considered new and material evidence and declined review, the reviewing court "must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." *Gartman v. Apfel*, 220 F.3d 918, 922 (8th Cir. 2000) (quoting another source).

**ALJ's RFC Assessment**

Plaintiff argues that the ALJ's decision did not properly weigh and consider the September 2004 opinion of Dr. Pearson, the February 2005 report of Dr. Rexroat, and Dr. Kunkel's treatment plan. She further argues that the ALJ's RFC assessment was not

14

supported by medical evidence.

The ALJ properly did not rely on the opinions of Dr. Pearson and Dr. Rexroat, as they were outside the relevant time period, and thus confined by *res judicata*. A closer question is presented by Plaintiff's argument that the ALJ's assessment of the Plaintiff's physical RFC was not supported by medical evidence. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Here, there is no specific opinion by a medical source as to Plaintiff's physical functional abilities. The absence, however, of an explicit reference to "work" in close proximity to the description of the claimant's medically evaluated limitations does not make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation; such explicit language is unnecessary where the medical evaluation describes the claimant's functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." *Id.* n.6; *see also Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (finding that substantial evidence supported the ALJ's conclusion that the claimant had the RFC to perform light work, where medical records indicated that she suffered only mild degenerative changes in her back condition, even though the medical evidence was silent with regard to work-related restrictions such as the length of time she could sit, stand, and walk).

The Court believes that here, the ALJ's assessment of Plaintiff's Physical RFC is

supported by sufficient medical evidence despite the absence of any one medical source opinion on the matter. Notably, Dr. Clarke determined on June 21, 2006, that Plaintiff did not have enough objective pathology to prevent her from working (for purposes of entitlement to Medicaid), and Dr. Kunkel released Plaintiff without restriction on February 13, 2008, following the intrathecal pump trial.

While the absence of physician-ordered functional restrictions, where a doctor was not asked to comment on the claimant's work ability, does not necessarily constitute "substantial evidence" of the absence of disability, the fact that no examining or treating physician ever placed any functional limitations on Plaintiff is a factor that is inconsistent with Plaintiff's allegations of disability. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993).

**ALJ's Evaluation of Plaintiff's Credibility**

Plaintiff argues that the ALJ improperly found and based his credibility finding on non-compliance with medical treatment, drug-seeking behavior, benefit seeking motivation based on her poor work history, and a lack of significant abnormalities within Dr. Kunkel's medical records. Plaintiff also asserts that the ALJ erred in not considering Plaintiff's limited daily activities in assessing her credibility.

"If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every [relevant] factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001). And an ALJ "may properly discount the claimant's testimony where it is inconsistent with the record."

16

*Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004). Upon review of the record, the Court concludes that the ALJ adequately considered the evidence before deciding that Plaintiff's subjective statements of disabling pain and mental disorders were not fully credible, and that this decision was supported by substantial evidence.

The ALJ's finding of non-compliance with medical treatment, by failing to show-up for scheduled appointments, is supported by the record which shows at least seven missed appointments from 2005 onward. The record also supports the ALJ's finding of drug seeking behavior, in light of the Medicaid report discussed by Dr. Zabairi in September 2005, and the fact that in August 2007, Plaintiff sought a refill of her Xanax prescription before it was due.

Plaintiff's weak earnings history prior to her alleged disability onset date was also a valid factor for the ALJ to consider in assessing Plaintiff's credibility. *See Fredrickson v. Barnhart*, 359 F.3d 972, 976-77 (8th Cir. 2004) (holding that the claimant was properly discredited due, in part, to her sporadic work record, reflecting low earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work).

## **CONCLUSION**

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this

case de novo." *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citation omitted). "'If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.'" *Id.* (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2011.